UNITED STATES of America, Plaintiff-Appellee,

v.

Hugh MacLeod PHEASTER, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Angelo INCISO, Defendant-Appellant.

Nos. 75–1004 and 74–3308.

United States Court of Appeals, Ninth Circuit.

Aug. 19, 1976.

John Van de Kamp (argued), Federal Public Defender, Los Angeles, Cal., for defendant-appellant in 75–1004.

Joe Reichmann (argued), Los Angeles, Cal., for defendant-appellant in 74–3308.

Robert C. Bonner, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

Before ELY and WALLACE, Circuit Judges, and RENFREW,* District Judge.

RENFREW, District Judge:

Appellants Pheaster and Inciso were tried before a jury in the United States District Court for the Central District of California and were convicted on all counts of a 12-count criminal indictment. Count One charged appellants, together with other unindicted co-conspirators whose names were unknown to the grand jury, with a conspiracy to kidnap and hold Larry Adell for ransom in violation of Section 1201(c), Title 18, United States Code. The remaining eleven counts charged Pheaster with depositing letters in the mail containing both requests for ransom for the release of Larry Adell (Counts Two, Four, Six, Eight, Ten and Twelve) and extortionate threats to injure Larry Adell (Counts Three, Five, Seven, Nine and Eleven), in violation of the first and second paragraphs, respectively, of Section 876, Title 18, United States Code. Inciso was charged with having aided and abetted the offenses charged in Counts Two through Twelve.[1] Judgments of conviction were entered on November 21, 1974. Pheaster and Inciso were each sentenced to seventy years' imprisonment on Counts Two through Twelve of the indictment and to life imprisonment on Count One, with the sentences on Count One to run concurrently with the 70-year terms imposed on Counts Two through Twelve.

The jurisdiction of this Court to review the judgments of conviction below rests upon Sections 1291 and 1294, Title 28, United States Code. In this appeal, Pheaster and Inciso have asserted a large number of errors by the court below. We have considered all of the arguments advanced by appellants and have found no reversible error. Accordingly, we affirm.

## I. FACTS

This case arises from the disappearance of Larry Adell, the 16-year-old son of Palm Springs multi-millionaire Robert Adell. At approximately 9:30 P.M. on June 1, 1974, Larry Adell left a group of his high school friends in a Palm Springs restaurant known as Sambo's North. He walked into the parking lot of the restaurant with the expressed intention of meeting a man named Angelo who was supposed to deliver a pound of free marijuana. Larry never returned to his friends in the restaurant that evening, and his family never saw him thereafter.

The long, agonizing, and ultimately unsuccessful effort to find Larry began shortly after his disappearance. At about 2:30 A.M. on June 2, 1974, Larry's father was telephoned by a male caller who told him that his son was being held and that further instructions would be left in Larry's car in the parking lot of Sambo's North. Those instructions included a demand for a ransom of $400,000 for the release of Larry. Further instructions regarding the delivery of the ransom were promised within a week. Although the caller had warned Mr. Adell that he would never see Larry again if the police or the F.B.I. were notified, Mr. Adell immediately called the F.B.I., and that agency was actively involved in the investigation of the case from the beginning.

Numerous difficulties were encountered in attempting to deliver the ransom, necessitating a number of communications between the kidnappers and Mr. Adell. The communications from the kidnappers included a mixture of instructions and threats, as well as messages from Larry. Before the kidnappers finally broke off communications on June 30, 1974, Mr. Adell had received a total of ten letters from the

---

* The Honorable Charles B. Renfrew, United States District Judge, Northern District of California, sitting by designation.

1. 18 U.S.C. § 2(a) provides as follows: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

kidnappers, nine of which were typed in a "script" style and one of which was handwritten. In addition, Mr. Adell had received two telephone calls from the kidnappers, one of which was tape-recorded by the F.B.I. In these communications, the kidnappers gave instructions for a total of four attempts to deliver the ransom, but it was never delivered for a number of reasons, and Larry was never released.

The instructions for the first delivery, set for June 8th, were nullified by the late delivery of the letter containing them on June 9th. The second delivery failed when, on June 12th, Mr. Adell balked at turning over the money without more adequate assurances that his son would be released. The third delivery on June 23d was aborted, apparently because of the kidnappers' awareness that the pick-up site was being monitored. A duffel bag containing the ransom money was thrown into the designated spot, but it was never retrieved by the kidnappers. The fourth and final attempt never really began. On June 30th, pursuant to instructions, Mr. Adell went to a designated hotel pay telephone to await further instructions but was never contacted. No further communications were received from the kidnappers, despite Mr. Adell's attempt to renew contact by messages published in the Los Angeles Times.

When it appeared that further efforts to communicate with the kidnappers would be futile, the F.B.I. arrested appellants, who had been under surveillance for some time, in a coordinated operation on July 14, 1974.

2. Section 1201 provides:

"(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:

"(1) the person is willfully transported in interstate or foreign commerce;

"(2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

"(3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 101(32) of the Federal Aviation Act of 1958, as amended (49 U.S.C. 1301(32)); or

## II. ERRORS ASSERTED BY PHEASTER

### A. Sufficiency of Count One of the Indictment

Appellant Pheaster argues that his conviction under Count One of the indictment must be reversed, because that count fails to state a federal offense and is therefore, incapable of supporting his conviction. Although this argument was not raised on appeal by appellant Inciso, it would, if accepted, apply equally to his conviction under Count One.

Count One of the indictment charges that appellants "did willfully and knowingly combine, conspire, confederate and agree together, with each other, and with other co-conspirators whose names are unknown to the Grand Jury to unlawfully kidnap and hold for ransom Larry Adell, the said Larry Adell having been willfully transported in interstate and foreign commerce following his kidnapping, in violation of Title 18, United States Code, Section 1201." The "natural construction" of the quoted language urged by Pheaster is a charge that "the conspiracy to kidnap [in which appellants were allegedly involved] arose *after* Larry Adell had been kidnapped and transported in interstate commerce." (Emphasis added.) The advantage to appellants of this construction is that it removes from their alleged involvement in the kidnapping all reference to interstate transportation of the victim, a necessary element of the substantive offense in Section 1201(a) and also of the conspiracy offense in Section 1201(c).[2] Under this interpretation, the

"(4) the person is a foreign official as defined in section 1116(b) or an official guest as defined in section 1116(c)(4) of this title,

shall be punished by imprisonment for any term of years or for life.

"(b) With respect to subsection (a)(1), above, the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce.

"(c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life."

grand jury's charge concerning appellants is simply that they conspired to kidnap Larry Adell and to hold him for ransom. Stripped of the allegation concerning interstate transportation, the alleged conspiracy to kidnap Larry from the earlier (hypothetical) kidnappers might constitute a state offense but would lack the requisite jurisdictional element of interstate transportation to convert it into a federal offense.

Before considering the merits of Pheaster's argument, it is appropriate that we state the standards that guide our decision. We begin with the requirement or Rule 7 of the Federal Rules of Criminal Procedure that an indictment "shall be a plain, concise and definitive written statement of the essential facts constituting the offense charged." Any evaluation of a challenged indictment must also take into account the more fundamental requirements imposed by the Sixth Amendment. The judicial interpretations of those requirements provide the framework for our analysis here.

■ A challenge to the sufficiency of an indictment is not a game in which the lawyer with the sharpest eye or the cleverest argument can gain reversal for his client. " 'Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused.' " *Russell v. United States,* 369 U.S. 749, 763, 82 S.Ct. 1038, 1046, 8 L.Ed.2d 240 (1962), *quoting Smith v. United States,* 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959). A criminal indictment must, however, perform certain essential functions which are of utmost importance to the protection of persons accused of crimes. The Supreme Court has emphasized that the performance of these functions is not to be compromised. *Russell,* 369 U.S. at 763, 82 S.Ct. 1038. In *Russell* the Supreme Court drew on its previous decisions in formulating the criteria to be used in evaluating a challenged indictment:

> "These criteria are, first, whether the indictment 'contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what

he must be prepared to meet," ' and, secondly, ' "in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." [Citations omitted.]' " *Id.* at 763–764, 82 S.Ct. at 1047.

■ Although essentially the same criteria apply to indictments charging conspiracies, certain differences do flow from the very nature of the crime of conspiracy. Because "the conspiracy is the gist of the crime" charged in such an indictment, the Supreme Court has held that "it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy, or to state such object with the detail which would be required in an indictment for committing the substantive offense." *Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 301, 71 L.Ed. 545 (1927) (citations omitted). Rather, the Court has held that:

> "In charging such a conspiracy 'certainty to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is' necessary." *Ibid., quoting Goldberg v. United States,* 277 F. 211, 213 (8 Cir. 1921).

In *Wong Tai* the alleged defect in the indictment was that it was insufficiently detailed with respect to the times, people, and places involved. In this Circuit and elsewhere, courts have relied upon *Wong Tai* to sustain indictments in which elements of the object offense have been not merely imprecisely stated but completely omitted. For example in *Stein v. United States,* 313 F.2d 518 (9 Cir. 1962), this Court considered an appeal from a conviction under 21 U.S.C. § 174 for trafficking in unlawfully imported narcotics. The conspiracy count of the indictment "failed to allege that the appellant knew that the heroin had been illegally imported" although such knowledge was a necessary element of the substantive offense. *Id.* at 519. Although

we held that the necessary facts could be implied from the indictment, we held alternatively that the omission of such an allegation was not fatal to a charge of conspiracy to commit the substantive offense. *Id.* at 520–521. *See also Brown v. United States,* 403 F.2d 489 (5 Cir. 1969), *cert. denied,* 397 U.S. 927, 90 S.Ct. 932, 25 L.Ed.2d 106 (1970) (indictment sufficient despite failure to allege knowledge by defendant that heroin had been imported into the United States contrary to law as required under 21 U.S.C. § 174); *Danielson v. United States,* 321 F.2d 441 (9 Cir. 1963) (indictment sufficient despite mingling elements of forgery and uttering under 18 U.S.C. § 495). *But cf. Nelson v. United States,* 406 F.2d 1136 (10 Cir. 1969) (indictment charging conspiracy to transport altered securities in interstate commerce fatally defective because of failure to allege the acts were accompanied with unlawful or fraudulent intent as required by 18 U.S.C. § 2314).

Finally, we must note that the asserted inadequacy of Count One was first brought to the attention of the district court only after all the evidence had been received in an extensive jury trial. Failure of an indictment to state an offense is, of course, a fundamental defect which can be raised at any time. *See, e. g., United States v. Clark,* 412 F.2d 885, 888 (5 Cir. 1969); *Chappell v. United States,* 270 F.2d 274, 276 (9 Cir. 1959). However, the very limited resources of our judicial system require that such challenges be made at the earliest possible moment in order to avoid needless waste. Consequently, although such defects are never waived, indictments which are tardily challenged are liberally construed in favor of validity. For example, this Court held that when an indictment is not challenged before the verdict, it is to be upheld on appeal if " 'the necessary facts appear in any form or by fair construction can be found within the terms of the indictment.' " *Kaneshiro v. United States,* 445 F.2d 1266, 1269 (9 Cir.), *cert. denied,* 404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d 543 (1971), *quoting Hagner v. United States,* 285 U.S. 427, 433, 52 S.Ct. 417, 76 L.Ed. 861 (1932). *See Wright, Federal Practice and Procedure* : Criminal § 123, at 225–226. In our view, the same standard should apply here, where the challenge came in a motion for acquittal after all evidence had been received. Such a long delay in raising the issue suggests a purely tactical motivation of incorporating a convenient ground of appeal in the event the jury verdict went against the defendants. Furthermore, the fact of the delay tends to negate the possibility of prejudice in the preparation of the defense. The Court of Appeals for the Seventh Circuit has applied a stringent standard similar to that stated in *Kaneshiro* in cases where no pretrial motion attacking the sufficiency of the indictment was made. *United States v. Logwood,* 360 F.2d 905, 907 (1966). We think that such a standard is appropriate here.

Although Count One inexplicably and inexcusably falls far short of a model pleading of a conspiracy offense under Section 1201(c), it is well established that an indictment need not be drafted in the most precise form possible. The issue before us on this appeal is whether, under the standards set out above, Count One is so defective that reversal of the convictions under it must be ordered. Although the question is not a frivolous one, we find that reversal is not mandated.

We have no difficulty in rejecting Pheaster's imaginative but rather farfetched interpretation of Count One. In construing the language of an indictment, courts must be guided by common sense and practicality. *United States v. Anderson,* 532 F.2d 1218, 1222 (9 Cir. 1976). Pheaster's "double kidnapping" interpretation of Count One clearly fails that test, especially when the language of the disputed count is read as a whole. Absent an explicit incorporation provision in the charging language, a conspiracy indictment's specification of overt acts cannot be used to supply the allegation of a critical element completely missing from the charging language. *United States v. Knox Coal Co.,* 347 F.2d 33, 38 (3 Cir. 1965), *cert. denied, Lippi v. United States,* 382 U.S. 904,

86 S.Ct. 239, 15 L.Ed.2d 157 (1965). Nevertheless, reference to the overt acts is appropriate to confirm an otherwise common-sense interpretation of an allegation which is included in the charging language. A reading of the overt act alleged in Count One confirms that the allegation concerning Larry Adell's transportation in interstate commerce is to be attributed to appellants and their unnamed co-conspirators and not to another group of kidnappers whose existence is sought to be inferred from the admittedly poor phrasing of Count One. This interpretation of Count One eliminates the foundation on which Pheaster's argument was built.

Although we are convinced that Pheaster's argument · concerning Count One is without merit, our consideration of the indictment has brought to light another argument which is related to the one raised by Pheaster and which we mention for the sake of completeness. The careless drafting of Count One makes it possible to argue that the allegation of conspiracy does not embrace the allegation of the interstate transportation of Larry Adell. That is, Count One might be paraphrased to charge that appellants and others conspired to kidnap Larry and conspired to hold him for ransom and, importantly, that he actually *was* transported in interstate commerce following his kidnapping pursuant to the conspiracy. So construed, Count One might be seen as the conjunction of a part of an adequate conspiracy charge with another part of an adequate substantive offense charge, thus achieving an inadequate hybrid charge of a non-existent federal crime. Although all of the necessary elements could be found in some form, the failure to adhere consistently either to a conspiracy allegation or to a substantive offense allegation could be argued to be a fatal defect, requiring reversal.

▄▄▄ Having stated the argument, we reject it. When an objection to an indictment is not timely made, the reviewing court has considerable leeway to imply the necessary allegations from the language of the indictment. *See, e. g., Kaneshiro v. United States, supra,* 445 F.2d at 1268–1269. If the ambiguous language of Count One is read as an allegation that Larry Adell was transported in interstate commerce, the indictment is sufficient because "the allegation of acts which would amount to commission of the substantive offense was merely descriptive of the conspiracy." *Reno v. United States,* 317 F.2d 499, 502 (5 Cir.), *cert. denied,* 375 U.S. 828, 84 S.Ct. 72, 11 L.Ed.2d 60 (1963). Under the liberal rules of interpretation which are to be applied here, we hold that the necessary elements of a violation of Section 1201(c) can be found in the language of Count One.[3]

---

3. The district court also had no difficulty in rejecting Pheaster's interpretation of Count One, but the reporter's transcript of the trial does indicate the court's concern that the indictment might be defective. Following an extended colloquy between court and counsel concerning Pheaster's motion for acquittal under Count One, the court stated the following interpretation of Count One:

"This charges a conspiracy between both defendants, followed by a kidnapping and transportation across state lines pursuant to the said conspiracy." R.T. Vol. 11, p. 1566.

This interpretation apparently carried forward into the jury instructions. Although the court clearly charged that the defendants were on trial for conspiracy to violate 18 U.S.C. § 1201(a) as provided in 18 U.S.C. § 1201(c), it did include an element which would not otherwise be included in a conspiracy charge. The district court's instruction concerning the essential elements of the crime charged in Count One was as follows:

"Here are the essential elements. First, that two or more persons *conspired* together at or about the time alleged *to unlawfully kidnap Larry Adell, to transport him in interstate commerce and hold him for ransom.*

"The second element: That the defendant in question willfully became a member of the said conspiracy.

"THIRD: *That pursuant to the said conspiracy, Larry Adell was in fact kidnapped and was in fact transported in interstate commerce following his kidnapping;*

"FOURTH: That one of the conspirators knowingly committed at least one of the overt acts charged in the indictment at or about the time and place alleged;

"FIFTH: That such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged." R.T. Vol. 12, p. 1794 (emphasis added).

Referring to the functions that indictments must serve in our criminal justice system, we find that Count One, despite its defects, adequately served those functions in this case. Pheaster has not claimed either before the district court or before us that the language of Count One has in any way prejudiced the preparation of his defense. If such a claim had been made, the facts of this case would tend to belie it. Pheaster was represented by unusually competent and experienced counsel;[4] yet, the challenge to the indictment came only at the end of the trial, after all the evidence had been received. Pheaster's co-defendant, Inciso, was also convicted under Count One but has not asserted its inadequacy in his appeal. Pheaster's argument bordered on the formalistic, relying on an extremely strained interpretation of the language of Count One. Finally, although a fatally defective indictment cannot be saved by remedial jury instructions, we note that, if anything, the jury instructions in this case worked to the considerable benefit of appellants. Similarly, no claim has been made to the district court or on appeal that the defective drafting of Count One would in any way impair appellants' ability to plead

their conviction in any subsequent prosecution. The language of Count One speaks in terms of conspiracy, and the count itself is captioned by a reference to the conspiracy provision in 18 U.S.C. § 1201(c). *Kaneshiro v. United States, supra,* 445 F.2d at 1269.

Because Count One can be read to include an allegation of a conspiracy to commit all of the elements of the substantive offense specified in § 1201(a), and because there has been no suggestion that the defective drafting caused any confusion as to the charges that had to be met, we find that Count One of the indictment is sufficient to support the convictions in this case.

### B. Compliance with the Miranda Requirements

Pheaster contends that the district court erred in refusing to suppress certain incriminating statements made by him following his arrest and certain tangible evidence found and seized as a direct result of those statements. In his pre-trial motion to suppress, Pheaster advanced two grounds for suppression: first, that the statements were made involuntarily as a result of physical abuse and threats by the arresting F.B.I. agents, and second, that the arresting

The third element in the court's instructions required the jury to find that two critical elements of the substantive offense were in fact committed, a finding that is not necessary for a conspiracy conviction. However, immediately after enumerating the five elements of the crime charged, the district court stated the following summary of the findings necessary to convict the defendants, this time omitting any reference to a requirement of an actual kidnapping and transportation in interstate commerce:

"If you find beyond a reasonable doubt that the existence of the conspiracy charged in the indictment has been proved and that during the existence of the conspiracy one of the overt acts alleged was knowingly done by one of the conspirators in furtherance of the object or purposes of the conspiracy, *then proof of the conspiracy is complete* and it is complete as to every person found by you to have been willfully a member of the conspiracy at the time the overt act was committed, regardless of which of the conspirators did the overt act." R.T. Vol. 12, pp. 1794–1795 (emphasis added).

The district court's instructions to the jury indicate that the trial judge read the language

of Count One to charge all the necessary elements of a conspiracy conviction, including the allegation that the appellants "conspired * * to transport him in interstate commerce * * *." Perhaps because of an abundance of caution arising from the poor phrasing of Count One, the district court also instructed the jury that it had to find two of the important elements of the substantive offense, although that offense was not charged in the indictment. The instructions were erroneous because of the combination of elements of the substantive and conspiracy offenses. The instructions placed a heavier burden on the government than was proper; however, since the defendants were convicted under this heavier standard, they have no cause for complaint. The error could only work in their favor and was therefore, harmless.

4. We must note that defense counsel for Pheaster, who raises this point, was at the time of the trial the Federal Public Defender for the Central District of California and is now the District Attorney for Los Angeles. He is a highly accomplished criminal lawyer.

agents failed to comply with procedures enunciated by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The alleged violation of Pheaster's rights under *Miranda* was compounded, combining an alleged failure to give any of the warnings required by that decision with an alleged failure to respect Pheaster's independent assertion of his desire to have counsel present during his interrogation.

A pretrial hearing on the suppression motion was held at which Pheaster and several of the arresting agents gave extensive testimony concerning the circumstances of Pheaster's arrest and his making of the subsequent statements. Pheaster claimed that, rather than being given the warnings required by *Miranda*, he had instead been told that he had *no* rights until the kidnapped boy was safely released. He further claimed that he had been physically abused, both by blows and by the use of intentionally tight handcuffs, and that his life had been repeatedly threatened.

The F.B.I. agents who arrested Pheaster denied his story, testifying that he had been advised of his rights under *Miranda*, that the only force directed against him had been the minimum amount necessary to restrain him at the moment of his arrest, and that no threats had been made against his life.

Pheaster's statements were held to be admissible. In resolving the conflict of testimony, the district court chose to believe the F.B.I. agents. The court rejected Pheaster's contention that he had made the statements involuntarily, finding that there had been "no coercion, no abuse, no overcoming of the defendant's will." R.T. Vol. 4, p. 236. The court also rejected Pheaster's contention that he had been denied his rights under *Miranda*, finding that warnings which were "adequate and sufficient under the circumstances" had been given and that "the defendant's conduct constitute[d] a waiver of the rights of which he was advised and which he had prior knowledge of." *Ibid.* As an alternative ground, the court held that Pheaster's statements

"were volunteered and not the result of any custodial interrogation." *Ibid.*

The only issue here is the correctness of the district court's ruling on the alleged noncompliance by the F.B.I. agents with the requirements of *Miranda*. Specifically, Pheaster argues that the warning found by the district court to have been given was inadequate under *Miranda*, and that the F.B.I. agents failed to respect his rights under *Miranda* by continuing to interrogate him after he stated that he wanted to see an attorney.

A brief summary of the circumstances of Pheaster's arrest and his making of the subsequent statements will suffice to frame the issues now before us. Because the district court's holding that Pheaster was not physically abused or threatened is not challenged on this appeal, we excise those allegations from the following account. Shortly after 6 P.M. on July 14, 1974, four F.B.I. agents went to Pheaster's apartment to arrest him, having previously secured an arrest warrant. Pheaster was arrested in front of the apartment building. Even as the agents struggled to restrain him, Pheaster stated, "I want an attorney right now." R.T. Vol. 4, p. 179. The agents identified themselves and informed Pheaster that he was under arrest for extortion in connection with the kidnapping of Larry Adell. After his hands were handcuffed behind his back, Pheaster was taken back into his apartment and seated on the couch. Shortly thereafter, he was formally given his *Miranda* warning by one of the agents, who, at the suppression hearing, summarized the warning as follows:

"I told him that he had a right to remain silent; that if he did not, and spoke, it could be used against him. I told him he was entitled to counsel, and if he could not afford one, the Government would furnish him one." R.T. Vol. 4, p. 158.

The agent admitted that he said nothing to Pheaster about his right to have an attorney present *during* the interrogation. He further testified that as the warning was being given, Pheaster interrupted to state that he knew his rights and to repeat his

demand to see a lawyer. Despite the interruption, the warning summarized above was completed. Pheaster was then told that he would be provided an appointed attorney when he was taken before the magistrate following his booking at county jail. After a short delay while arrangements were made for the care of his young son, Pheaster was taken from his apartment to a waiting F.B.I. car for transportation to county jail. Because of his resistance, it was necessary to use some force to get him into the car.

No questioning of Pheaster occurred in the apartment. Once in the car, the agent who was in charge of the arrest engaged Pheaster in a "firm" "one-way conversation". This conversation consisted primarily of a recitation of the evidence against Pheaster, although Pheaster was asked several times whether he knew where Larry Adell was being held. Approximately fifteen to twenty minutes after the trip to county jail began, Pheaster was told that a fingerprint found on the ninth note from the kidnappers had been positively identified as his. Upon hearing that information, Pheaster stated that he had "something to do" with the kidnapping and began to supply details about the kidnapping scheme, his confederates, and the location of Larry Adell. The agent in charge of the arrest testified that, "Once [Pheaster] admitted implication, which was at the first stop, he was in a generally cooperative, amenable mood." R.T. Vol. 4, p. 161. At approximately 6:45 P.M. Pheaster was again asked if he was aware of his rights and was reminded that he did not have to speak to the agents. He replied that he knew his rights, but that he had "had such a small part in this that I want, you know, help you get the boy back." R.T. Vol. 4, pp. 214–215. A number of stops were made on the way to the county jail so that the information supplied by Pheaster could be relayed to F.B.I. headquarters by telephone. At one point Pheaster indicated that the boy was

in Las Vegas, and the agents telephoned the F.B.I. to commence an investigation there. In addition, the agents received reports back from F.B.I. headquarters which they relayed to Pheaster in an attempt to verify his story. Telephones were used because of concern that a breach of security might result from a radio transmission. Throughout the evening Pheaster amplified and amended his story.

The F.B.I. car was diverted from its route to the county jail when Pheaster said that he would show the agents where he had disposed of the typewriter he had used to type the ransom notes. After the car started toward Long Beach Bay, where Pheaster claimed to have thrown the typewriter, he changed his story and stated that the typewriter was in a storage locker in a laundry room behind his apartment and that the agents could get it. The agents then drove back to Pheaster's apartment where he led them to the locker he had described. When the locker was forced open, a portable typewriter, a .22 caliber automatic pistol, a knapsack, and a towel were found. Later that night, at approximately 1 A.M., the agents transferred to another car parked at the Edgewater Hyatt, because the first car was almost out of gas and no service stations were open. Pheaster was booked at the Los Angeles County Jail at approximately 3 A.M. on July 15, 1974, almost nine hours after his arrest.[5]

### 1. *The Adequacy of the Miranda Warning*

■ The question of the adequacy of the *Miranda* warning to Pheaster after his arrest need not detain us long. Pheaster's argument here is based upon the admitted failure of the F.B.I. agent to inform him specifically that his right to a government-appointed attorney, about which he was informed, also included the right to have that attorney present *during* his interrogation. We need not decide whether, in the

---

5. We recognize that this is an unusually long interval between arrest and booking, but there is no dispute that Pheaster began to cooperate with the agents approximately fifteen minutes

after the car began going toward the county jail. Pheaster's counsel did not put any particular emphasis on the overall delay in booking.

abstract, this omission from an otherwise complete *Miranda* warning is a fatal flaw,[6] because it is abundantly clear that Pheaster was completely aware of this right.

We recognize that in *Miranda* the Supreme Court held that "[n]o amount of circumstantial evidence that the person may have been aware of [his right to have an attorney present during interrogation] will suffice to stand in [the] stead [of the warning]." 384 U.S. at 471–472, 86 S.Ct. at 1626. Thus, the Supreme Court's holding would preclude us from finding that Pheaster had prior knowledge of his right simply because of his almost continuous history of involvement with the criminal justice system. Here, however, we do not rely upon circumstantial evidence, for there is direct evidence from Pheaster's own mouth that he was aware of his right. As the agent was informing him of his *Miranda* rights, Pheaster interrupted, insisting that he knew his rights and repeating his earlier demand to see an attorney immediately. To hold on these facts that the disputed evidence must be suppressed because of the alleged defect in the *Miranda* warning would be to convert a warning to a ritual and, in the truest sense of a hackneyed expression, to exalt form over substance. Needless to say, we decline to do so.

### 2. *Waiver of the Miranda Rights*

The next and more difficult question for decision is whether Pheaster's statements made after he demanded to see an attorney but before he was provided one are admissible. Pheaster's position is built upon the following language in *Miranda*: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. 474, 86 S.Ct. 1628. The Government argues that by agreeing to talk to the arresting F.B.I. agents on the way to county jail, Pheaster waived his rights under *Miranda*.

In *United States v. Hodge,* 487 F.2d 945 (5 Cir. 1973), the Court of Appeals for the Fifth Circuit held that a confession obtained under circumstances remarkably similar to those in the instant case was admissible. After having been arrested and given adequate warnings of his rights, Hodge requested to have an attorney. In response to that request, the investigating agent "terminated the interview" but proceeded to explain "the charges and evidence" against Hodge. 487 F.2d at 946. Apparently prompted by the evidence already in the Government's hands, Hodge then changed his mind and volunteered to make a statement. After waiving his right to counsel, Hodge made a confession which was subsequently introduced at trial. On appeal, Hodge urged the court to hold that "once an accused has invoked his right to have an attorney present, all questioning and discussion for whatever purpose must cease until an attorney is obtained for the accused." *Ibid.* In affirming Hodge's conviction, the court rejected his literal interpretation of *Miranda,* holding instead that "[a]n arrestee can change his mind after requesting an attorney" so long as the change of mind is "voluntarily and freely made". *Id.* at 947. In so holding, the court distinguished *United States v. Crisp,* 435 F.2d 354 (7 Cir. 1970), *cert. denied,* 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971) (a case relied upon by Hodge), because in that case, "the police subjected the defendant to intensive *questioning* immediately following a refusal to answer." 487 F.2d at 947 (emphasis added).

This key distinction between questioning the suspect and presenting the evidence available against him was also central to *United States v. Davis,* 527 F.2d 1110 (9 Cir., 1975), a recent decision of this Court involving a waiver of *Miranda* rights in a different, but closely related, context. In *Davis* a confession obtained almost immediately after a suspect had been advised of

---

**6.** We note that decisions from other circuits have held that in the context of an otherwise complete *Miranda* warning, this omission is not a fatal flaw. *United States v. Floyd,* 496 F.2d 982, 988–989 (2 Cir. 1974); *United States v.* *Adams,* 484 F.2d 357, 361–362 (7 Cir. 1973); *but cf. Smith v. Rhay,* 419 F.2d 160, 163 (9 Cir. 1969), where the defendant was also not told that if he could not afford an attorney, one would be appointed to represent him.

his rights and had indicated a desire to remain silent was held to be admissible. After indicating his desire not to talk to an investigating F.B.I. agent, Davis was shown a bank surveillance photograph of himself participating in the robbery and was asked whether he wanted to reconsider his position. After examining the picture, Davis said, "Well, I guess you've got me", and proceeded to sign a waiver of his rights under *Miranda*. This Court rejected Davis' contention that his confession was improperly admitted into evidence, citing the recent decision of the Supreme Court in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), for the general proposition that "the right to talk or remain silent is the defendant's, and no mechanical application of *Miranda* should prevent the informed, voluntary and free exercise of that right." 527 F.2d at 1111. Turning to the particular facts of the *Davis* case, this Court held that the confession was properly admitted:

"Here, the agent merely asked Davis if he wanted to reconsider his decision to remain silent, in view of the picture; *the questioning did not resume* until after Davis had voluntarily agreed that it should [see *U. S. v. Jackson*, 436 F.2d 39, 40–41 (9th Cir. 1970), *cert. denied*, 403 U.S. 906 [91 S.Ct. 2209, 29 L.Ed.2d 682] (1971)]. The Government has met its heavy burden of showing that Davis's waiver of his rights to remain silent and to counsel, signed before he confessed, was made knowingly and intelligently. There is no evidence of any psychological or physical pressure on Davis, or of over-

reaching of any kind." At 1111 (emphasis added; bracketed material in original).

The Supreme Court in *Mosley* expressly disavowed any intention to discuss the effect of a suspect's request for an attorney. 423 U.S. at 101 n. 7, 96 S.Ct. 321. However, we find instructive the Court's treatment of a closely related question: the effect of a suspect's indication that he desires to remain silent.[7] In *Mosley* the Court rejected a literal interpretation of *Miranda*, holding that the exercise of the right to remain silent does not preclude all further questioning. Rather, in the context of the particular facts of *Mosley*, the Court held that a confession made two hours after Mosley had indicated his desire to remain silent was admissible. The initial interrogation had been terminated when Mosley indicated that he did not want to talk. Two hours later, after giving a new *Miranda* warning, another officer questioned him about a different crime. After being informed of evidence implicating him in the second crime, Mosley made an incriminating statement which was subsequently introduced at his trial. Although the specific holding in *Mosley* is not direct precedent for the resolution of this appeal, *Mosley* does indicate both a recognition that the procedure set out in *Miranda* is not as clear as the language of that opinion might suggest and a willingness to import a greater degree of flexibility in the application of *Miranda* to varying factual situations.

We have concluded that a waiver of rights under *Miranda* can occur despite

---

7. In *Miranda* the discussion of both questions appears in the same paragraph and in very similar language. Because of the similarity in phrasing, an extended quotation is justified:

"Once warnings have been given, the subsequent procedure is clear. *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody

interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. *If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.* * * *

" * * * If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time." 384 U.S. at 473–474, 86 S.Ct. at 1627 (emphasis added; footnote omitted).

an earlier demand to have an attorney. Although the *Hodge* decision is terse, we believe that the result reached in that decision is consistent with the willingness to import a greater degree of flexibility and realism in the application of *Miranda*, which has been recently evidenced in the decision of the Supreme Court in *Mosley* and the decision of this Court in *Davis*.[8] The Government, of course, bears a "heavy burden * * * to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda, supra,* 384 U.S. at 475, 86 S.Ct. at 1620.

 Our examination of the record in this case has revealed that the decision regarding waiver was a close one; yet, on balance, we believe that the district court was correct in deciding that the Government had met its "heavy burden" in establishing Pheaster's waiver. Because it was not possible for the F.B.I. agents who arrested Pheaster to provide him with an attorney at the moment that he demanded one, the key question is whether the failure of the agents to sit mute during the ride to county jail, where an attorney could be provided, mandates the exclusion of Pheaster's statements. On the particular facts of this case, we are convinced that such exclusion was not mandated. This conclusion would have been significantly easier had there been an express waiver of rights but the absence of such a waiver is not determinative, for this Court has held that in appropriate circumstances a waiver of *Miranda* rights can be implied rather than ex-

press. *United States v. Hilliker,* 436 F.2d 101, 103 (9 Cir.), *cert. denied,* 401 U.S. 958, 91 S.Ct. 987, 28 L.Ed.2d 242 (1971); *see also United States v. Vigo,* 487 F.2d 295, 299 (2 Cir. 1973) (statement after defective *Miranda* warning held to be volunteered). Although this question is not specifically addressed in *Mosley,* the recitation of the facts indicates an implied, rather than an express, waiver by Mosley. 423 U.S. at 104, 96 S.Ct. 321. We think that this is a case in which waiver can be implied. It is critical to focus on the fact that Pheaster agreed to cooperate with the agents after he had been in the car for only fifteen to twenty minutes—a point not challenged in his brief. Thus, although he was in the car for a longer period, his cooperation was not the result of lengthy incommunicado detention. This is not a case in which there was an intentional delay in providing an attorney in the hope that the suspect would yield to pressure and recant his demand for an attorney. It is also important to note that Pheaster's statements came as a result of an objective, undistorted presentation of the extensive evidence against him, particularly the positive identification of his fingerprint on the ninth note.[9] As in *Hodge* and *Davis,* the questioning did not really begin until Pheaster had clearly indicated his willingness to cooperate. Finally, Pheaster was reminded early in the evening that he did not have to talk to the agents, but he continued to talk because of his expressed desire to help them find Larry Adell. Under all the circumstances of this case, we conclude that waiver of the *Miranda* rights, including the earlier demand to see an attorney, was properly found.

8. Although we recognize that a demand to see an attorney may involve different considerations from an indication of a desire to remain silent, we believe that waiver is possible in either situation.

9. One of the district court's grounds for holding that Pheaster's statements were admissible was the finding that the statements were volunteered and not the result of custodial interrogation. There can be no doubt that Pheaster was in custody at the time of his statements, so the key word in the district court's finding was "interrogation". As stated in the text, the con-

clusion that interrogation had not begun is consistent with the analysis in *Hodge* and *Davis.* In the instant case it could be argued that there was an element of interrogation. The F.B.I. agent in charge of Pheaster's arrest testified that, because of his concern for the safety of the kidnap victim, he did ask Pheaster approximately three times where Larry Adell was being kept. In the context of this case and in light of the agent's justifiable concern for the safety of Larry Adell, we find that these questions were reasonable and did not rise to the level of interrogation proscribed by *Miranda.*

## C. *Constitutionality of the Voice Identification*

Another of the issues raised on appeal by Pheaster is the district court's failure to exclude the testimony of Officer John W. Turley who identified the tape-recorded voice of one of the kidnappers as that of Pheaster. Pheaster argues that the circumstances of a pretrial identification of the same recording by Officer Turley were so "impermissibly suggestive" as to require the exclusion of the testimony at trial. On July 2, 1974, an F.B.I. agent asked Officer Turley whether he knew Pheaster and whether he could identify his voice. Upon receiving affirmative answers, the agent played for Officer Turley a tape-recorded telephone conversation between Mr. Adell and one of the kidnappers. Officer Turley identified the caller as Pheaster. In seeking this identification, the agent mentioned no other names and played no other recorded voices to Officer Turley.

■ The pretrial identification procedure challenged on this appeal is unusual, involving an auditory rather than a visual identification of a defendant. Although we have not been directed to other cases involving similar circumstances, the standards that we must apply are nonetheless clear. In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court synthesized its previous decisions involving suggestive identification procedures. Although *Neil* and the other cases discussed therein involved only visual identifications, the following quotation from *Neil* clearly indicates that suggestive identification procedures are fungible:

"Some general guidelines emerge from these cases as to the relationship between suggestiveness and misidentification. It is, first of all, apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' *Simmons v. United States*, 390 U.S. [377] at 384 [88 S.Ct. [967] at 971, 19 L.Ed.2d 1247]. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in *Foster*. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as *Stovall* makes clear, the admission of evidence of a showup without more does not violate due process." 409 U.S. at 198, 93 S.Ct. at 381 (footnote omitted).

Because the possibility of "irreparable misidentification" is as great when the identification is from a tape-recording as when it is from a photograph or a line-up, we hold that the same due process protection should apply to either method.

■ No litmus paper test is available to evaluate the constitutional adequacy of the identification procedures used in any particular case. Rather, as stated by the Supreme Court in *Neil*, the "central question [is] whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." 409 U.S. at 199, 93 S.Ct. at 382. This is, in essence, the test used by this Court in evaluating challenges to identification procedures. *United States v. Baxter*, 492 F.2d 150 (9 Cir. 1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). The Supreme Court decision in *Neil* and our decision in *Baxter* enumerate a number of factors to be considered in evaluating the "totality of the circumstances" of a specific case. In *Baxter* this Court gave careful consideration to the proper analysis of a photographic identification procedure claimed to be improperly suggestive. Although not all of the factors mentioned in *Baxter* apply to the identification of a tape-recorded voice, the general approach and the policy considerations

are essentially the same. *Baxter* establishes a broad two-part analysis, the first part focusing on the necessity for the photographic identification and the second on the particular circumstances surrounding the identification. 492 F.2d at 171.

The necessity for the use of a particular identification procedure is a function of the law enforcement problem facing the law enforcement authorities in each case. As the legitimate necessity for a particular identification procedure grows more acute, the willingness of the courts to tolerate the procedure also increases. The decision of the Supreme Court in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), provides an unusually graphic example of this relationship. The circumstances of the identification in that case were dramatic. The suspect, a black man, was displayed in manacles to the victim of the crime as she lay near death in a hospital bed. Emphasizing that the constitutionality of the identification procedure depended upon the "totality of the circumstances surrounding" the identification, the Court held that the procedure had been "imperative" and was constitutional. The Court explained its decision as follows:

> " 'Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, "He is not the man" could have resulted in freedom for Stovall. The hospital was not far distant from the courthouse and jail. No one knew how long Mrs. Behrendt might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that Mrs. Behrendt could not visit the jail the police followed the only feasible procedure and took Stovall to the hospital room. Under these circumstances, the usual police station line-up, which Stovall now argues he should have had, was out of the question.' " 388 U.S. at 302, 87 S.Ct. at 1972; *quoting United States v. Denno*, 355 F.2d 731 (2 Cir. 1966).

In *Baxter* this Court stated that necessity for a photographic identification typically exists either when the suspect is not in custody or when the law enforcement officials need "to quickly determine whether they [are] on the right track." 492 F.2d at 171. The facts of the instant case clearly reveal the necessity for a voice identification procedure. The speaker on the tape recording was one of the kidnappers and presumably knew where the victim was being held. Pheaster was not in custody. Although he was obviously suspected of being involved in the plot, confirmation of his involvement was critical so that all available resources could be used most efficiently in the effort to rescue Larry Adell.

Having determined that there was abundant necessity for the use of a voice identification procedure, we turn our attention to the second part of the two-part analysis established by *Baxter*, an examination of the circumstances of the identification. First, we must determine whether the identification procedure here was suggestive or, as we phrased it in *Baxter*, whether the "conduct of the law enforcement officials" tended to "focus attention on a single suspect." 492 F.2d at 172. In the instant case, Officer Turley's pretrial exposure to the tape recording was undeniably suggestive. By asking Officer Turley whether he knew Pheaster and could identify his voice, the investigating agent ran the risk of implanting the suggestion that the voice was in fact that of Pheaster. Certainly a preferable procedure would have been to ask Officer Turley whether he could identify the voice on the tape without naming Pheaster. However, the issue before us is not whether a better procedure was available, but whether the procedure used, under all the circumstances, was constitutionally defective. We have concluded that it was not.

In *Baxter*, we identified "the length of time and the conditions in which the witness observed the defendant" as a major factor in the assessment of a challenged identification. 492 F.2d at 172. The great danger of suggestive identification procedures is that the memory of a witness may be manipulated so that the mental image derived from the identification procedure

supplants that derived from the witness's own experience. This danger is especially great with the fragile and fleeting memory of a crime victim. Courts have recognized, however, that crimes are not often carried out under ideal conditions for observation. For example, in *Neil, supra,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401, the Supreme Court held that a one-person "show-up" in which the defendant was viewed alone by a rape victim was not a denial of due process despite the suggestiveness of the procedure and a lapse of seven months between the rape and the first identification. The Supreme Court found that the victim's observation of her attacker over a period of approximately thirty minutes in dim artificial light and moonlight was an adequate basis for her positive identification of the defendant.

Despite the potential for misidentification inherent in the instant case, we are convinced that Officer Turley's identification was nevertheless reliable. When compared to cases such as *Neil* the reliability of Officer Turley's identification is obvious. This is not a case involving the memory of a victim based on one observation under emotionally charged circumstances. Officer Turley testified that he had known Pheaster for a period of fifteen years and had had numerous conversations with him. Furthermore, Officer Turley had spoken to Pheaster approximately a month before his first identification of the kidnapper's voice on the tape. Officer Turley testified that his in-court identification of the tape-recorded voice was based upon his independent acquaintance with Pheaster and not upon the pretrial identification. Although we do not endorse in all cases the identification procedure used here, we do not believe that under the attendant circumstances Pheaster's due process rights were violated as a result of it.[10]

### D. Constitutionality of the Handwriting Exemplars

Pheaster argues that the somewhat unorthodox method of obtaining and utilizing exemplars of his handwriting violated his Fifth Amendment right against self-incrimination. The agent who obtained the handwriting exemplars from Pheaster testified that the normal practice for obtaining such exemplars is to have the suspect copy from materials placed before him. In the instant case, the agent dictated the material that Pheaster was to write. The reason that this modified procedure was followed is quite clear. The notes from the kidnappers included a number of rather unusual spelling mistakes, and the material dictated to Pheaster included those words. The fact that a number of the same spelling mistakes appeared both in the notes and in the exemplars was introduced into evidence at the trial. A conventional analysis was also performed to compare the handwriting on the two sources, but the Government expert

10. Pheaster analogizes his case to *United States v. Fowler,* 439 F.2d 133 (9 Cir. 1971), in which we held that a "pretrial photographic identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification." *Id.* at 133. In a prosecution for smuggling marijuana across the border, the defendant's defense was that he had driven the car across the border as a favor to a man named Ellis without knowing that the marijuana was hidden in the car. Having established that the car had been purchased in Los Angeles several days before, the police continued their investigation in the following manner:

"After having arrested Fowler and placed him in custody, the investigating officers ultimately went to the used car lot where the car had been purchased. They spoke with the car salesman, Valencio, and showed him two photographs of Fowler, taken on the night of his arrest. No other photographs were displayed. The salesman indicated that the man pictured was the one who had bought the car in the name of Ellis." *Id.* at 133–134.

Despite some superficial similarities, we do not think that *Fowler* is persuasive authority for the instant case. Because the suspect had already been arrested, *Fowler,* unlike the instant case, was "not a case where the suspect was still at large and a photographic identification was not only mandatory but a matter of some urgency." *Id.* at 134. In *Baxter* this Court limited the *per se* exclusionary rule of *Fowler,* holding that it did not apply where the witness " 'did not testify as to his pretrial identification and where the facts amply demonstrated an independent basis for the in-court identification.' " 492 F.2d at 171, *quoting Fowler, supra,* 439 F.2d at 134.

could only testify that the handwriting on the note from the kidnappers appeared to be disguised. He was unable to state positively that the note from the kidnappers was written by Pheaster.

Pheaster acknowledges that the taking and subsequent use of handwriting exemplars for identification purposes does not violate the Fifth Amendment's protection against self-incrimination. In *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), the Supreme Court reached this conclusion through the following reasoning:

> "*First.* The taking of the exemplars did not violate petitioner's Fifth Amendment privilege against self-incrimination. The privilege reaches only compulsion of 'an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers,' and not 'compulsion which makes a suspect or accused the source of "real or physical evidence" . . . .' *Schmerber v. State of California*, 384 U.S. 757, 763–764 [86 S.Ct. 1826, 1833, 16 L.Ed.2d 908]. One's voice and handwriting are, of course, means of communication. It by no means follows, however, that every compulsion of an accused to use his voice or write compels a communication within the cover of the privilege. A mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside its protection. *United States v. Wade, supra*, 388 U.S., at 222–223 [87 S.Ct. [1926], at 1929–1930, 18 L.Ed.2d 1149]. No claim is made that the content of the exemplars was testimonial or communicative matter. Cf. *Boyd v. United States*, 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746]." 388 U.S. at 266–267, 87 S.Ct. at 1953.

Pheaster argues that the instant case is distinguishable from *Gilbert* in that the handwriting exemplar in the instant case was used to show similar spelling mistakes rather than similar writing characteristics.

The admitted distinction is argued to be important, because the use of the handwriting exemplar to show spelling mistakes requires the defendant to give evidence which is "the product of his mind and intellectual processes." Used in such a way, the handwriting exemplar is said to pass from the realm of an "identifying characteristic" to that of a "communication" protected by the Fifth Amendment. In advancing this argument, Pheaster emphasizes that spelling is a skill acquired by learning.

In our view, Pheaster has succeeded in identifying a distinction without a difference. Like spelling, penmanship is acquired by learning. The manner of spelling a word is no less an "identifying characteristic" than the manner of crossing a "t" or looping an "o". All may tend to identify a defendant as the author of a writing without involving the content or message of what is written. No protected communication is involved.

### E. Admissibility of Evidence Seized During the Search of Pheaster's Apartment

Although the search of his apartment was conducted pursuant to a search warrant, Pheaster moved before trial to suppress certain tangible evidence seized during that search. On this appeal, he now challenges the district court's denial of that motion. The first argument advanced by Pheaster is that the search warrant was invalid because of an absence of probable cause to believe that the specified items were on the premises. Pheaster also argues that, even assuming probable cause did exist for the issuance of the search warrant, some of the items seized during the search and subsequently introduced at trial were beyond the scope of the warrant and not within any of the recognized exceptions to the general rule that warrantless searches are *per se* unreasonable.

We find Pheaster's contention that there was no probable cause for the search of his apartment to be totally unconvincing and undeserving of extended discussion. The items specified in the search

warrant were the types of things that a person who had participated in a kidnapping and in an extortion plot might possess. The F.B.I. had very strong reason to believe that Pheaster was involved in the kidnapping of Larry Adell. It is true that no one in the F.B.I. could swear out an affidavit to the effect that they had seen the listed items in Pheaster's apartment, but that inability does not negate the existence of probable cause. The search of Pheaster's apartment did not violate the Fourth Amendment's protection against "unreasonable" searches and seizures. We do not read the decision of this Court in *United States v. Bailey*, 458 F.2d 408 (9 Cir. 1972), a decision heavily relied upon by Pheaster, to mandate a different conclusion. Rather, the recent decision by this Court in *United States v. Spearman*, 532 F.2d 132 (9 Cir. 1976), represents what we believe to be the proper, common-sense approach to the question of probable cause for the issuance of a search warrant. We can do no better than to quote *Spearman* :

> "We recognize that probable cause to believe a person is guilty of a crime does not always constitute probable cause to search any property belonging to him. However, we have upheld many searches where
>
> > 'the nexus between the items to be seized and the place to be searched rested not on direct observation . . but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property.'
>
> *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970) (citations omitted)."
> 532 F.2d at 133.

Having considered the search warrant and the transcript of the testimony of the F.B.I. agents who conducted the search of the apartment, we also reject Pheaster's second argument. All of the items challenged by Pheaster were either encompassed within the items described in the search warrant or seized pursuant to the "plain view" exception. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Quigg v. Estelle*, 492 F.2d 343 (9 Cir.), *cert. denied*, 419 U.S. 848, 95 S.Ct. 86, 42 L.Ed.2d 78 (1974).

### F. Admissibility of Evidence Seized during the Search of Pheaster's Automobile

Pheaster also challenges the introduction of certain tangible evidence which was obtained during a warrantless search of his automobile shortly after he was arrested. After Pheaster was arrested, his car was driven to an F.B.I. garage where it was carefully searched both inside and out. Our review of the record has not revealed any error on the part of the district court.

■ The law governing warrantless searches of automobiles has been carefully considered in the recent decision of this Court in *United States v. McClain*, 531 F.2d 431 (9 Cir., 1976), and need not be repeated here. Essentially, there must be probable cause for the search and exigent circumstances justifying the failure to obtain a warrant. In our view, both of these conditions were satisfied in the instant case.

■ Pheaster's argument that there was no probable cause for the search of his car borders on the frivolous. The F.B.I. had substantial evidence showing Pheaster's involvement in the kidnapping of Larry Adell. Pheaster had driven the car on a number of occasions during the period after the abduction and before his arrest, and it had been seen in the vicinity of two of the designated drop sites. Clothing or equipment used by the kidnappers or their fingerprints might have been in the car. Furthermore, Pheaster had been observed placing a carrying case in the trunk of the car. He had obtained the case from a woman with whom he had had a conversation which was apparently related to his efforts to obtain the ransom money. There was abundant probable cause to search the car for that case and also for other evidence relating to the kidnapping which might plausibly be found in the car. *United States v. Spearman, supra.*

Pheaster's argument that the search cannot be justified under the exigent circumstances exception is also without merit. The car was parked on a public street and was easily accessible to persons who might remove the car or evidence located in it. The F.B.I. did not know the identities of all of the parties to the kidnapping plot but prior to Pheaster's arrest had determined that Larry Adell was not being held by either Pheaster or Inciso. There was a very real possibility that one of the other participants in the plot might attempt to destroy evidence that might be in the car. Thus, the agents were entitled to impound the car and to search it immediately; they were not required to post a guard around it. *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). An additional factor adding to the exigency of the circumstances was the possibility that the car contained evidence that would enable the F.B.I. to find Larry Adell before, as apparently happened, he was killed by his abductors.

Pheaster argues that exigent circumstances did not exist in the instant case, because the information that gave the agents probable cause to search Pheaster's car was known by them well in advance of their decision to search. It does appear that the agents might have attempted to secure a search warrant for the car at the same time that they obtained the arrest warrant for Pheaster on July 12, 1974, two days before his arrest. Although we believe that whenever possible the better practice is to obtain a search warrant in advance, the failure to do so does not negate other exigencies justifying a warrantless search of an automobile. On this point, we are in complete agreement with the plurality opinion in the recent Supreme Court decision in *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), which disposed of a similar argument in the following manner:

"Assuming that probable cause previously existed, we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment. Exigent circumstances with regard to vehicles are not limited to situations where probable cause is unforeseeable and arises only at the time of arrest." *Id.* at 595, 94 S.Ct. at 2472.

### G. District Court's Procedure of Making a Record of the Exhibits

Pheaster argues that the district court's procedure of making a record of the exhibits marked for identification was improper and constituted reversible error. In the presence of the jury, the court read into the record the number and description of all of the exhibits and handled them in such a way that the jury might be able to see them. We agree that this procedure is highly improper and fraught with the potential for grave prejudice to the defendant, but we have examined the circumstances of the action taken by the district court and are convinced that the defendants were not prejudiced by the action. However, we emphasize that the procedure should not be followed in the presence of the jury. Nothing is gained, and a great amount may be lost.

### III. ERRORS ASSERTED BY INCISO

### A. Admissibility of Hearsay Testimony Concerning Statements of Larry Adell

Appellant Inciso argues that the district court erred in admitting hearsay testimony by two teenaged friends of Larry Adell concerning statements made by Larry on June 1, 1974, the day that he disappeared. Timely objections were made to the questions which elicited the testimony on the ground that the questions called for hearsay. In response, the Government attorney stated that the testimony was offered for the limited purpose of showing the "state of mind of Larry".[11] After instructing the

---

11. Although there was little discussion of the issue at trial, it was well briefed. In its trial memorandum, the Government advanced three theories to support the use of the disputed

jury that it could only consider the testimony for that limited purpose and not for "the truth or falsity of what [Larry] said", the district court allowed the witnesses to answer the questions. Francine Gomes, Larry's date on the evening that he disappeared, testified that when Larry picked her up that evening, he told her that he was going to meet Angelo at Sambo's North at 9:30 P.M. to "pick up a pound of marijuana which Angelo had promised him for free". R.T. Vol. 5, p. 286. She also testified that she had been with Larry on another occasion when he met a man named Angelo, and she identified the defendant as that man. Miss Gomes stated that it was approximately 9:15 P.M. when Larry went into the parking lot. Doug Sendejas, one of Larry's friends who was with him at Sambo's North just prior to his disappearance, testified that Larry had made similar statements to him in the afternoon and early evening of June 1st regarding a meeting that evening with Angelo. Mr. Sendejas also testified that when Larry left the table at Sambo's North to go into the parking lot, Larry stated that "he was going to meet Angelo and he'd be right back." R.T. Vol. 5, p. 338.

Inciso's contention that the district court erred in admitting the hearsay testimony of Larry's friends is premised on the view that the statements could not properly be used by the jury to conclude that Larry did in fact meet Inciso in the parking lot of Sambo's North at approximately 9:30 P.M. on June 1, 1974. The correctness of that assumption is, in our view, the key to the analysis of this contention of error. The Government argues that Larry's statements were relevant to two issues in the case. First the statements are said to be relevant to an issue created by the defense when Inciso's attorney attempted to show that Larry had not been kidnapped but had disappeared voluntarily as part of a simulated kidnapping designed to extort money from his wealthy father from whom he was allegedly estranged. In his brief on appeal, Inciso concedes the relevance and, presumably, the admissibility of the statements to "show that Larry did not voluntarily disappear". However, Inciso argues that for this limited purpose, there was no need to name the person with whom Larry intended to meet, and that the district court's limiting instruction was insufficient to overcome the prejudice to which he was exposed by the testimony.[12] Second, the Government argues that the statements are relevant and admissible to show that, as intended, Larry did meet Inciso in the parking lot at Sambo's North on the evening of June 1, 1974. If the Government's second theory of admissibility is successful, Inciso's arguments regarding the excision of his name from the statements admitted under the first theory is obviously mooted.

In determining the admissibility of the disputed evidence, we apply the standard of Rule 26 of the Federal Rules of Criminal

---

testimony. First, the Government relied upon the state-of-mind exception as interpreted in *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). Second, because the statement of the declarant also indicated an intention to obtain marijuana, a controlled substance, the Government argued that the testimony was admissible as a declaration against penal interest. Finally, because of purported statements by Larry that he was afraid of being kidnapped by Angelo (evidence which was apparently never introduced), it was argued that the testimony was admissible under a hearsay exception allowing statements of mental condition. Only the first of these theories is involved in this appeal.

**12.** Were this the only theory under which the testimony could come in, we would tend to agree with Inciso. In such a context, the po-

tential prejudice would far outweigh the potential relevance of the testimony, and a limiting instruction would not sufficiently safeguard the defendant. In *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933), Justice Cardozo expressed in memorable language the practical inadequacies of limiting instructions:

"Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out." *Id.* at 103–104, 54 S.Ct. at 25.

Procedure which governed at the time of the trial below. Under that standard, the District Court was required to decide issues concerning the "admissibility of evidence" according to the "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

 The Government's position that Larry Adell's statements can be used to prove that the meeting with Inciso did occur raises a difficult and important question concerning the scope of the so-called "*Hillmon* doctrine*", a particular species of the "state of mind" exception to the general rule that hearsay evidence is inadmissible. The doctrine takes its name from the famous Supreme Court decision in *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). That the *Hillmon* doctrine should create controversy and confusion is not surprising, for it is an extraordinary doctrine. Under the state of mind exception, hearsay evidence is admissible if it bears on the state of mind of the declarant and if that state of mind is an issue in the case. For example, statements by a testator which demonstrate that he had the necessary testamentary intent are admissible to show that intent when it is in issue. The exception embodied in the *Hillmon* doctrine is fundamentally different, because it does not require that the state of mind of the declarant be an actual issue in the case. Instead, under the *Hillmon·* doctrine the state of mind of the declarant is used inferentially to prove other matters which are in issue. Stated simply, the doctrine provides that when the performance of a particular act by an individual is an issue in a case, his intention (state of mind) to perform that act may be shown. From that intention, the trier of fact may draw the inference that the person carried out his intention and performed the act. Within this conceptual framework, hearsay evidence of statements by the person which tend to show his intention is deemed admissible under the state of mind exception. Inciso's objection to the doctrine concerns its application in situations in which the declarant has stated his intention to do something *with another person*, and the issue is whether he did so. There can be no doubt that the theory of the *Hillmon* doctrine is different when the declarant's statement of intention necessarily requires the action of one or more others if it is to be fulfilled.

When hearsay evidence concerns the declarant's statement of his intention to do something with another person, the *Hillmon* doctrine requires that the trier of fact infer from the state of mind of the declarant the probability of a particular act not only by the declarant but also by the other person. Several objections can be raised against a doctrine that would allow such an inference to be made. One such objection is based on the unreliability of the inference [13] but is not, in our view, compelling.[14] A much more significant and troubling objection is based on the inconsistency of such an inference with the state of mind exception. This problem is more easily perceived when one divides what is really a compound statement into its component parts. In the in-

---

13. Because of this concern, one treatise states that, "Use of declarations of state of mind to prove subsequent conduct might, then, be limited to proof of conduct that would not have required the substantial cooperation of persons other than the declarant." McCormick's *Handbook of the Law of Evidence* 698 (E. Cleary ed. 1972). However, that same authority also recognizes that "courts have not imposed the limitation". *Id.* at 698–699.

14. The inference from a statement of present intention that the act intended was in fact performed is nothing more than an inference. Even where no actions by other parties are necessary in order for the intended act to be performed, a myriad of contingencies could intervene to frustrate the fulfillment of the intention. The fact that the cooperation of another party is necessary if the intended act is to be performed adds another important contingency, but the difference is one of degree rather than kind. The possible unreliability of the inference to be drawn from the present intention is a matter going to the weight of the evidence which might be argued to the trier of fact, but it should not be a ground for completely excluding the admittedly relevant evidence.

stant case, the statement by Larry Adell, "I am going to meet Angelo in the parking lot to get a pound of grass", is really two statements. The first is the obvious statement of Larry's intention. The second is an implicit statement of Angelo's intention. Surely, if the meeting is to take place in a location which Angelo does not habitually frequent, one must assume that Angelo intended to meet Larry there if one is to make the inference that Angelo was in the parking lot and the meeting occurred. The important point is that the second, implicit statement has nothing to do with Larry's state of mind. For example, if Larry's friends had testified that Larry had said, "Angelo is going to be in the parking lot of Sambo's North tonight with a pound of grass", no state of mind exception or any other exception to the hearsay rule would be available. Yet, this is in effect at least half of what the testimony did attribute to Larry.

Despite the theoretical awkwardness associated with the application of the *Hillmon* doctrine to facts such as those now before us, the authority in favor of such an application is impressive, beginning with the seminal *Hillmon* decision itself. *Hillmon, supra,* 145 U.S. 285, 12 S.Ct. 909, was a civil case involving a colorful dispute over certain life insurance claims. The factual issue in the case was whether Hillmon, who had purchased a number of life insurance policies naming his wife as beneficiary, had been killed by the accidental discharge of a gun in a campsite near Crooked Creek, Kansas. If he had been so killed, his wife was entitled to the benefits under the insurance policies. The defendant insurance companies contended, however, that Hillmon was not dead but was in hiding, and that the claims were part of a conspiracy to defraud the companies. While it was undisputed that someone had been killed in the campsite at Crooked Creek, there was complete disagreement as to who the victim

was. The defendants in *Hillmon* introduced evidence which tended to show that the body at Crooked Creek was not that of Hillmon, but was that of another man, Frederick Adoph Walters. As part of this attempt to show that it was Walters who was killed at Crooked Creek, the defendants attempted to introduce two letters written by Walters from Wichita, Kansas, shortly before he disappeared, never to be heard from again. In the letters, one written to his sister and the other to his fiancee,[15] Walters stated that he intended to leave Wichita in the near future and to travel with a man named Hillmon. In the letter to his financee, Walters explained that Hillmon was making the expedition to search for a suitable site for a sheep ranch, and that Hillmon had promised him employment at the ranch on very favorable terms. Plaintiff's objection to the introduction of the letters on the ground that they were incompetent, irrelevant, and hearsay was sustained by the trial court.

The Supreme Court summarily rejected the argument that the letters were admissible "as memoranda made in the ordinary course of business," 145 U.S. at 295, 12 S.Ct. at 912, but then held that they were admissible as evidence of Walters' intention:

"The letters in question were competent, not as narratives of facts communicated to the writer by others, nor yet as proof that he actually went away from Wichita, but *as evidence that*, shortly before the time when other evidence tended to show that he went away, *he had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon, than if there had been no proof of such intention.* In view of the mass of conflicting testimony introduced upon the question of whether it was the body of Walters that was found in Hillmon's camp, this evidence might properly influence the jury in determining that

---

**15.** The letter written to Walters' fiancee was produced and offered as evidence. The letter written to Walters' sister had been lost, but she

was prepared to testify as to its contents. 145 U.S. at 287–289, 12 S.Ct. 909.

question." 145 U.S. at 295–296, 12 S.Ct. at 912–913 (emphasis added).[16]

Although *Hillmon* was a civil case, the Supreme Court cited with approval a number of criminal cases in support of its decision. One of them, *Hunter v. State*, 11 Vroom (40 N.J.L.) 495, involved facts remarkably similar to those before us here. The Court summarized the facts and the holding of that case as follows:

"Upon an indictment of one Hunter for the murder of one Armstrong at Camden, the Court of Errors and Appeals of New Jersey unanimously held that Armstrong's oral declarations to his son at Philadelphia, on the afternoon before the night of the murder, as well as a letter written by him at the same time and place to his wife, each stating that he was going with Hunter to Camden on business, were rightly admitted in evidence." 145 U.S. at 299, 12 S.Ct. at 914.

The Court then quoted a long passage from the opinion of Chief Justice Beasley in *Hunter.* The primary concern expressed in that passage was whether there was anything unnatural about the victim's statements that might suggest an ulterior purpose and, hence, unreliability. Having found no indicia of unreliability,[17] Chief Justice Beasley brushed aside the suggestion that the specific reference to the defendant should have been omitted. Speaking rhetorically, Chief Justice Beasley asked:

"'If it is legitimate to show by a man's own declarations that he left his home to be gone a week, or for a certain destination, which seems incontestable, why may it not be proved in the same way that a designated person was to bear him company?'"

The Chief Justice then concluded:

"'If it was in the ordinary train of events for this man to leave word or to state where he was going, it seems to me it was equally so for him to say with whom he was going.' *Hunter v. State* [11 Vroom], 40 N.J.Law, 495, 534, 536, 538." 145 U.S. at 299, 12 S.Ct. at 914.

The *Hillmon* doctrine has been applied by the California Supreme Court in *People v. Alcalde*, 24 Cal.2d 177, 148 P.2d 627 (1944), a criminal case with facts which closely parallel those in *Hunter.* In *Alcalde* the defendant was tried and convicted of first degree murder for the brutal slaying of a woman whom he had been seeing socially. One of the issues before the California Supreme Court was the asserted error by the trial court in allowing the introduction of certain hearsay testimony concerning statements made by the victim on the day of her murder. As in the instant case, the testimony was highly incriminating, because the victim reportedly said that she was going out with Frank, the defendant, on the evening she was murdered. On appeal, a majority of the California Supreme Court affirmed the defendant's conviction, holding that *Hillmon* was "the leading case on the admissibility of declarations of intent to do an act as proof that the act thereafter was accomplished." 148 P.2d at 631. Without

---

16. Quoting from *Insurance Co. v. Mosley*, 8 Wall. 397, 404, 405, 19 L.Ed. 437 (1869), the Court stated the "rule applicable to this case" as follows:

"'Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence. Those expressions are the natural reflexes of what it might be impossible to show by other testimony. If there be such other testimony, this may be necessary to set the facts thus developed in their true light, and to give them their proper effect. As independent, explanatory, or corroborative evidence, it is often indispensable to the due administration of justice. Such declarations are regarded as verbal acts, and are as competent as any other testimony, when relevant to the issue. Their truth or falsity is an inquiry for the jury.'" 145 U.S. at 296, 12 S.Ct. at 913.

17. Inciso argues that the statements reported by Larry's friends should not have been admitted into evidence because Larry, "[a] sixteen year old boy involved with narcotics", was an unreliable declarant. We cannot agree with this argument. Our review of the record reveals nothing about the circumstances of the statements made by Larry to suggest any reason to doubt their reliability.

purporting to "define or summarize all the limitations or restrictions upon the admissibility of" such evidence, *id.* at 632, the court did mention several prudential considerations not unlike those mentioned by Chief Justice Beasley in *Hunter.* Thus, the declarant should be dead or otherwise unavailable, and the testimony concerning his statements should be relevant and possess a high degree of trustworthiness. *Id.* at 631. The court also noted that there was other evidence from which the defendant's guilt could be inferred. Applying these standards, the court found no error in the trial court's admission of the disputed hearsay testimony. "Unquestionably the deceased's statement of her intent and the logical inference to be drawn therefrom, namely, that she was with the defendant that night, were relevant to the issue of the guilt of the defendant." *Id.* at 632.

In addition to the decisions in *Hillmon* and *Alcalde,* support for the Government's position can be found in the California Evidence Code and the new Federal Rules of Evidence, although in each instance resort must be made to the comments to the relevant provisions.

Section 1250 of the California Evidence Code carves out an exception to the general hearsay rule for statements of a declarant's "then existing mental or physical state". The *Hillmon* doctrine is codified in Section 1250(2) which allows the use of such hearsay evidence when it "is offered to prove or explain acts or conduct of the declarant." The comment to Section 1250(2) states that, "Thus, a statement of the declarant's intent to do certain acts is admissible to prove that he did those acts." Although neither the language of the statute nor that of the comment specifically addresses the particular issue now before us, the comment does cite the *Alcalde* decision and, therefore, indirectly rejects the limitation urged by Inciso.

Although the new Federal Rules of Evidence were not in force at the time of the trial below, we refer to them for any light that they might shed on the status of the common law at the time of the trial. The codification of the state of mind exception in Rule 803(3) does not provide a direct statement of the *Hillmon* doctrine. Rule 803(3) provides an exemption from the hearsay rule for the following evidence:

> "*Then existing mental, emotional, or physical condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

Although Rule 803(3) is silent regarding the *Hillmon* doctrine, both the Advisory Committee on the Proposed Rules and the House Committee on the Judiciary specifically addressed the doctrine. After noting that Rule 803(3) would not allow the admission of statements of memory, the Advisory Committee stated broadly that

> "The rule of *Mutual Life Ins. Co. v. Hillmon* [citation omitted] allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed." Note to Paragraph (3), 28 U.S.C.A. at 585.

Significantly, the Notes of the House Committee on the Judiciary regarding Rule 803(3) are far more specific and revealing:

> "However, the Committee intends that the Rule be construed to limit the doctrine of *Mutual Life Insurance Co. v. Hillmon* [citation omitted] so as to render statements of intent by a declarant admissible *only to prove his future conduct, not the future conduct of another person.*" House Report No. 93–650, Note to Paragraph (3), 28 U.S.C.A. at 579 (emphasis added).

Although the matter is certainly not free from doubt, we read the note of the Advisory Committee as presuming that the *Hillmon* doctrine would be incorporated in full force, including necessarily the application in *Hillmon* itself. The language suggests that the Advisory Committee presumed that such a broad interpretation was the

prevailing common law position. The notes of the House Committee on the Judiciary are significantly different. The language used there suggests a legislative intention to cut back on what that body also perceived to be the prevailing common law view, namely, that the *Hillmon* doctrine could be applied to facts such as those now before us.

■ Although we recognize the force of the objection to the application of the *Hillmon* doctrine in the instant case,[18] we can-

not conclude that the district court erred in allowing the testimony concerning Larry Adell's statements to be introduced.

### B. *Admissibility and Abuse of Hearsay Testimony Concerning Statements of Pheaster*

Inciso also raises certain issues concerning the testimony of Mrs. Elmyra Mapes, a Government witness. Inciso's first contention is that the district court erred in admitting testimony by Mrs. Mapes concerning

---

18. Criticism of the *Hillmon* doctrine has come from very distinguished quarters, both judicial and academic. However, the position of the judicial critics is definitely the minority position, stated primarily in dicta and dissent.

In his opinion for the Court in *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed.2d 196 (1933), Justice Cardozo indicated in dicta an apparent hostility to the *Hillmon* doctrine. *Shepard* involved hearsay testimony of a dramatically different character from that in the instant case. The Court reviewed the conviction of an army medical officer for the murder of his wife by poison. The asserted error by the trial court was its admission, over defense objection, of certain hearsay testimony by Mrs. Shepard's nurse concerning statements that Mrs. Shepard had made during her final illness. The nurse's testimony was that, after asking whether there was enough whiskey left in the bottle from which she had drunk just prior to her collapse to make a test for poison, Mrs. Shepard stated, "Dr. Shepard has poisoned me." One theory advanced by the Government on appeal was that the testimony was admissible to show that Mrs. Shepard did not have suicidal tendencies and, thus, to refute the defense argument that she took her own life. The Court rejected that theory, holding that the testimony had not been admitted for the limited purpose suggested by the Government and that, even if it had been admitted for that purpose, its relevance was far outweighed by the extreme prejudice it would create for the defendant. In rejecting the Government's theory, the Court refused to extend the state of mind exception to statements of memory. In his survey of the state of mind exception, Justice Cardozo appeared to suggest that the *Hillmon* doctrine is limited to "suits upon insurance policies", *id.* at 105, 54 S.Ct. 22, although the cases cited by the Court in *Hillmon* refute that suggestion.

The decision in *Shepard* was relied upon by Justice Traynor of the California Supreme Court in his vigorous dissent from the decision reached by the majority in *People v. Alcalde, supra,* 148 P.2d 627. Justice Traynor argued that the victim's declarations regarding her

meeting with Frank could not be used to "induce the belief that the defendant went out with the deceased, took her to the scene of the crime and there murdered her * * * without setting aside the rule against hearsay." *Id.* at 633. Any other legitimate use of the declaration, in his opinion, was so insignificant that it was outweighed by the enormous prejudice to the defendant in allowing the jury to hear it.

Finally, the exhaustive analysis of a different, but related, hearsay issue by the Court of Appeals for the District of Columbia in *United States v. Brown*, 160 U.S.App.D.C. 190, 490 F.2d 758 (1974), provides inferential support for the position urged by Inciso. The issue in that case was the admissibility of hearsay testimony concerning a victim's extrajudicial declarations that he was "[f]rightened that he may be killed" by the defendant. *Id.* at 762. After surveying the relevant cases, the court stated a "synthesis" of the governing principles. One of the cases which was criticized by the court was the decision of the California Supreme Court in *People v. Merkouris*, 52 Cal.2d 672, 344 P.2d 1 (1959), a case relied upon by the Government in the instant case. The court in *Merkouris* held that hearsay testimony showing the victim's fear of the defendant could properly be admitted to show the probable identity of the killer. The court in *Brown* expressed the following criticism of that holding, a criticism which might also apply to the application of the *Hillmon* doctrine in the instant case:

"Such an approach violates the fundamental safeguards necessary to the use of such testimony [citation omitted]. Through a circuitous series of inferences, the court reverses the effect of the statement so as to reflect on *defendant's* intent and actions rather than the state of mind of the declarant (victim). This is the very result that it is hoped the limiting instruction will prevent." 490 P.2d at 771 (emphasis in original).

For a frequently cited academic critique of the *Hillmon* doctrine, see Maguire, *The Hillmon Case—Thirty-Three Years After*, 38 Harv.L. Rev. 709 (1925).

statements made to her by Pheaster which tended to implicate Inciso in the kidnapping scheme. The issue here is a limited one of whether the elements of the co-conspirator exception to the hearsay rule were present. Inciso's second contention is that the Government attorney deliberately distorted Mrs. Mapes' testimony in his final argument to the jury.

It is well settled that evidence of statements made by one conspirator is in some circumstances admissible against a co-conspirator despite the fact that the evidence might otherwise be inadmissible under the hearsay rule. See, e. g., *United States v. Calaway*, 524 F.2d 609, 612 (9th Cir., 1975); *United States v. Ellsworth*, 481 F.2d 864, 870–871 (9 Cir.), cert. denied, 414 U.S. 1041, 94 S.Ct. 544, 38 L.Ed.2d 332 (1973); *Carbo v. United States*, 314 F.2d 718, 735–736 (9 Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). Indeed, Inciso does not challenge this basic proposition. Rather, he bases his argument on the alleged failure of the Government to establish all of the necessary foundational requirements of the co-conspirator exception. Focusing exclusively on the foundational requirement that the statements by the hearsay declarant must be made in furtherance of the conspiracy, Inciso argues that "Pheaster's statements were not in furtherance of any conspiracy and should not have been admissible against Inciso."

A·rather extensive body of case law has emerged from this Court's consideration of the co-conspirator exception. The basic framework of analysis was established in our decision in *Carbo v. United States,* supra, 314 F.2d 718. As stated in *Carbo*:

"The necessary foundation consists of three distinct prerequisites. First: that the declaration is in furtherance of the conspiracy; second: that it was made during the pendency of the conspiracy; third: that there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant with it." *Id.* at 735 n. 21. Ac-

cord, *United States v. Snow*, 521 F.2d 730, 733 (9th Cir., 1975).

The question raised in *Carbo* was not the definition of these foundational requirements, but rather the allocation of responsibility between judge and jury in determining whether they have been satisfied. The factual issue in *Carbo* was whether the defendants were co-conspirators, but the analysis is equally applicable to factual findings concerning the other foundational requirements:

"It is for the judge then, and not the jury, to determine the admissibility of the declarations. In making this determination the test is not whether the defendants' connection had by independent evidence been proved beyond a reasonable doubt, but whether, accepting the independent evidence as credible, the judge is satisfied that a prima facie case (one which would support a finding) has been made. Thereafter it is the jury's function to determine whether the evidence, including the declarations, is credible and convincing beyond a reasonable doubt." *Id.* at 737.

Under the principles established in *Carbo*, the question here is whether the Government made a *prima facie* showing that the statements made by Pheaster to Mapes were "in furtherance of the conspiracy". This is a factual determination for which the trial court is uniquely well placed. Inciso argues that the statements were an admission of guilt to a third party which were likely to hinder or destroy the conspiracy. The broader view taken by the Government and by the district court was that Mrs. Mapes' role was considerably more than that of a disinterested third party. Mrs. Mapes testified under a grant of immunity. She had accompanied Pheaster to the first drop-site in Palm Springs and had taken a position where she might have performed the counter-surveillance contemplated by the ransom letters. During the conversation of June 22, 1974, in which the disputed statements were made, Pheaster attempted to recruit Mrs. Mapes to accompany him to the second drop-site in Corona

on the following day. Although Mrs. Mapes denied going to Corona, a woman was observed driving Pheaster's car in the vicinity of the Corona drop-site on June 23, 1974. Also, during the meeting on June 22, 1974, Pheaster transferred to Mrs. Mapes the typewriter used to type the ransom letters. The evidence was sufficient to support a finding that the statements had been made in furtherance of the conspiracy.

 Inciso also contends that the action of the Government attorney, both in his examination of Mrs. Mapes and in his final argument to the jury deliberately distorted her testimony concerning Inciso's involvement in the kidnapping. The Court has reviewed Mrs. Mapes' testimony in its entirety and has concluded that the conduct of the Government attorney does not constitute reversible error. The questions asked by the Government attorney were not devious or confusing, and the answers given by Mrs. Mapes indicated that the business deal that Pheaster had with Inciso was that of abducting Larry Adell (although Mrs. Mapes did not know the identity of the victim at that time). In his final argument to the jury, the Government attorney may have overstated Mrs. Mapes' testimony, but no objection was raised by the defense although other matters were mentioned at the side bar immediately after the close of the Government's argument. Any prejudice to Inciso from the closing argument was surely cured when, pursuant to a request from the jury, the entire testimony of Mrs. Mapes was reread.

## C. Admissibility of Evidence Seized During the Search of Inciso's Residence

Inciso also challenges the district court's refusal to suppress certain tangible evidence found during a search of his residence on July 14, 1976. The search was made pursuant to a search warrant, the validity of which is not disputed. Rather, the argument is based upon certain alleged procedural irregularities associated with the suppression hearing and upon the alleged seizure of items not covered by the warrant

and not within any exceptions to the warrant requirement.

 Because it was originally contemplated that nothing seized from Inciso's residence would be introduced at trial, no suppression motions were filed before trial. When the Government later decided to introduce evidence seized at that time, the district court exercised its discretion to allow the evidence to be introduced, subject to any suppression motions that Inciso might make. Motions were made, and a hearing was conducted at which the District Court determined that the evidence was admissible. Later the Government attempted to introduce other evidence seized at the same time. When Inciso objected, the court overruled the objection for the reasons previously stated. While the procedure was not ideal, it was, for the most part, dictated by the Government's vacillation concerning the evidence that it would present. The district court exercised its discretion to allow the evidence to be introduced. In doing so, it gave Inciso sufficient opportunity to present his objections and to preserve his position on appeal.

 We have examined Inciso's Fourth Amendment argument and find it to be without merit. The items seized were either covered by the search warrant or seized under the "plain view" exception once the agents were lawfully within Inciso's residence. *Coolidge v. New Hampshire, supra,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 78; *Quigg v. Estelle, supra,* 492 F.2d 343.

 Finally, Inciso argues that a revolver seized during the search of his residence should have been excluded, because its prejudice to him outweighed its probative value. In support of this argument, Inciso states that "[i]f Larry Adell was kidnapped there is absolutely no evidence that any gun was ever used." In a trial for an apparent kidnapping, the circumstances of which are completely unknown because of the victim's continued absence and probable death at the hands of his kidnappers, the district court decision to allow the introduction of the revolver was not error.

### D. *Rebuttal Testimony of Mr. and Mrs. Adell*

Inciso argues that the district court erred in allowing the Government to call Mr. and Mrs. Adell to testify in rebuttal. Decisions concerning the use of rebuttal evidence lie within the sound discretion of the trial court. We do not believe that this discretion was abused in the instant case.

### E. *Sufficiency of the Evidence to Support Conviction*

Inciso challenges the sufficiency of the evidence as to all twelve counts of the indictment. In considering this challenge, we must determine " 'whether the evidence, considered most favorably to the government, was such as to permit a rational conclusion by the [trier of fact] that the accused was guilty beyond a reasonable doubt.' " *United States v. Jones*, 518 F.2d 64, 65 (9 Cir. 1975), *quoting United States v. Nelson*, 419 F.2d 1237, 1242 (9 Cir. 1969) (brackets in original). The sufficiency of the evidence to show that Larry Adell was transported in interstate commerce is considered *infra*. We now consider the sufficiency of the evidence to show that Inciso conspired with others to kidnap Larry Adell (Count One) and knowingly participated in communicating ransom demands and extortionate threats to his father (Counts Two–Twelve).

The evidence against Pheaster can properly be characterized as overwhelming. It is, therefore, highly significant that Pheaster and Inciso were in frequent communication with each other by telephone until a few days prior to the kidnapping. Larry Adell disappeared from a parking lot where he had gone with the express intention of meeting Inciso. After Larry's disappearance, Pheaster and Inciso stopped communicating with each other over their residence telephones. However, they apparently continued to contact each other by using pay telephones. Pheaster was observed in the vicinity of the pay telephone at a particular service station in Long Beach. A scrap of paper containing the number of that pay telephone was found in the search of Inciso's residence. Telephone company records showed that the dates of the calls made to that number from Palm Springs, where Inciso was working, directly corresponded to major events in the kidnappers' efforts to obtain the ransom from Mr. Adell. Although fictitious numbers were given by the caller to the telephone company on four occasions, accurate numbers were given on two occasions, and the pay telephones with those numbers were located less than a block from the place where Inciso was working. In addition to calls placed over pay telephones, Pheaster and Inciso met several times at out-of-the-way places. Finally, Inciso's involvement in the kidnapping scheme could be inferred from Mrs. Mapes' testimony. Although circumstantial, the evidence against Inciso is sufficient to support the jury verdict.

### IV. ERROR ASSERTED BY BOTH APPELLANTS

Both Pheaster and Inciso contend that there is insufficient evidence of interstate or foreign transportation of Larry Adell to sustain their convictions under Count One of the Indictment. Although Section 1201(b) of Title 18 provides a statutory presumption of interstate or foreign commerce which would be triggered by the facts of this case, the district court did not instruct the jury as to the statutory presumption because of its concern that the provision was unconstitutional.[19] Because of that decision by the district court, we must determine whether there was sufficient evidence of such transportation. The standard for such a review was stated *supra*. Viewed according to that standard, the evidence of interstate transportation, while not overwhelming, is sufficient to sustain the conviction.

Shortly after his arrest on July 14, 1974, Pheaster told F.B.I. agents that Larry Adell was being held in Las Vegas by a man named "Ron". There was substantial corroborative evidence that Larry had been

19. We express no opinion as to the constitutionality of that provision.

moved out of the Los Angeles area to Las Vegas after the third attempt to pay the ransom failed. Larry was seen on or about July 1, 1974, by the father of one of his friends in a drugstore in Apple Valley, California, which is between Palm Springs and Las Vegas. At that time he appeared to be "stone pale" and "under some kind of mild form of sedation." R.T. Vol. 10, pp. 1330, 1332–1333. Larry was later seen on two occasions in Las Vegas, once by Marilyn Coffin and another time by Laurie Cote, both of whom knew him from high school. When he was seen by Marilyn Coffin on July 3, Larry was with two other boys at a blackjack table in one of the casinos. When he was seen by Laurie Cote sometime between July 4 and 6, Larry was walking quickly through one of the casinos and appeared thinner and paler than when she had last seen him. Although the circumstances of Larry's presence in Las Vegas might appear somewhat inconsistent with those of a kidnap victim, that point was argued to the jury and rejected. There was sufficient evidence from which the jury could find that Larry Adell was transported in interstate commerce.[20]

For the reasons set out above, we affirm the convictions.

ELY, Circuit Judge (concurring and dissenting):

My Brother Renfrew, in his customary way, has written a scholarly and thoughtful opinion in this sad and difficult case. I concur in the affirmance of Pheaster's conviction on the substantive charges, none of which involved kidnapping *per se*, but I must respectfully dissent from the majority's affirmance of Inciso's conviction on the charge of conspiracy.[1] Viewing all the evidence in the light most favorable to the prosecution, as I must, I am absolutely convinced that the evidence is insufficient either to support his conviction or to establish beyond a reasonable doubt that the victim was transported in interstate commerce. Such transportation is, of course, an indispensable element of the crime. And as to that issue, I simply cannot agree that there was "substantial corroborative evidence" that the victim, Larry Adell, was "moved out of the Los Angeles area to Las Vegas." Standing alone, Pheaster's initial comment to the police, which he subsequently changed at least twice, that Adell was being held in Las Vegas, Nevada, is not adequate. *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954). The sighting of Adell in Apple Valley, California, by a witness, adds nothing. Thus, the question is whether Pheaster's statement is sufficiently corroborated by the testimony of two of Adell's school friends that each saw Adell at different times, apparently under no restraint, in gambling casinos in Las Vegas around July 4, 1974. In both cases, the sightings were very brief, at a distance, and in profile. One of the witnesses even admitted that she was not sure the person she had seen was, in fact, Adell. This testimony, as I see it, does not rise to the necessary level of "substantial independent evidence which would tend to establish the trustworthiness of the statement." *Opper, supra* at 93, 75 S.Ct. at 164. Assuming its trustworthiness, however, it does not negate, beyond a reasonable doubt, the possibility that Adell went to Las Vegas alone and without coercion. The evidence is simply too tenuous to prove with the requisite

---

20. The Government also argues that the jury could have found that Larry Adell was transported in foreign commerce. In order to obtain a supply of phenobarbitol, a drug that could be used to sedate a kidnap victim, Pheaster told a doctor that the drug was for his epileptic son, who was going to accompany him on a trip to Mexico. There was some reference in the record to a "calcite" mine owned by Pheaster in Mexico. In view of our holding as to interstate commerce, we need not pass on the sufficiency of this evidence.

1. I also dissent from the affirmance of Pheaster's conviction on the charge of conspiracy because I believe that the evidence was insufficient to establish interstate transportation of the victim. However, since the Government's counsel stated, during oral argument, that Pheaster will be eligible for parole in 15 years under both his life sentence for conspiracy and his 70-year sentence for the substantive crimes, I would apply the concurrent sentence rule in his case.

degree of certainty the essential element of interstate transportation.

In respect to Inciso's participation in the kidnapping conspiracy, there is no doubt that Adell's hearsay statement that the latter was going to meet "Angelo" was the strongest evidence linking Inciso to the conspiracy. The statement was obviously relevant to Adell's state of mind and his future intent. But it was also highly prejudicial to Inciso. Adell's statement could not be admitted without the attendant and substantial risk that, despite the judge's limiting instruction, the jury would rely on the statement to prove not only the act of Adell, but also those of Inciso.

I am obligated by the almost century-old precedent of *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909 (1892) to concur in the majority's decision that the trial court did not commit reversible error in admitting Adell's alleged statement. Nevertheless, while my Brother Renfrew is doubtless correct that a majority of courts have adhered to the so-called *Hillmon* doctrine,[2] it is also true that the holding has been subjected to severe criticism by some of our Nation's most distinguished judicial scholars. I am impelled, therefore, strongly to emphasize my own agreement with the views of Mr. Justice Cardozo in *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933) and Chief Justice Traynor in his dissenting opinion in *People v. Alcalde*, 24 Cal.2d 177, 148 P.2d 627 (1944). As Justice Traynor wrote, "A declaration as to what one person intended to do . . . cannot safely be accepted as evidence of what another probably did." *Id.* at 189, 148 P.2d at 633. The fact that the members of the House Judiciary Committee specifically noted their intent to limit the *Hillmon* doctrine in Rule 803(3) of the new Federal Rules of Evidence indicates that the sound criticisms voiced by those two eminent members of the judiciary, as well as other legal scholars,[3] are now widely believed to be valid.

**2.** *See* note 18 *supra*.

**3.** *See* Maguire, *The Hillmon Case—Thirty-Three Years After*, 38 Harv.L.Rev. 709 (1925);

Seligman, *An Exception to the Hearsay Rule*, 26 Harv.L.Rev. 146 (1912).